Argued and submitted July 2, in Case No. 031183, reversed and remanded for resentencing, otherwise affirmed; in Case No. 031199, reversed and remanded for resentencing, otherwise affirmed December 12, 2007

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

FORREST CLAYTON NORMAN,
*Defendant-Appellant.*

Tillamook County Circuit Court
031183, 031199
A125399 (Control); A125400

174 P3d 598

Jesse Wm. Barton argued the cause and filed the brief for appellant.

Susan G. Howe, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Haselton, Presiding Judge, and Armstrong and Rosenblum, Judges.

HASELTON, P. J.

## HASELTON, P. J.

This appeal arises from two cases, Tillamook County Circuit Court Nos. 031183 and 031199, which were consolidated for trial before a jury. With respect to Case No. 031183, defendant challenges his convictions and sentences on three counts of attempted first-degree assault, ORS 161.405; ORS 163.185, and one count of felony attempt to elude a police officer, ORS 811.540. Defendant contends, principally, that (1) the trial court erred in precluding testimony from an expert witness that the actions of police officers, in attempting to apprehend defendant, had not comported with proper police practice, including with respect to the use of deadly physical force and (2) the court erred in determining that, for purposes of calculating defendant's criminal history score under the sentencing guidelines, one of defendant's attempted assault convictions did not arise from the "same criminal episode" as the other two. As described below, we reject defendant's first contention, as well as his other assignments of error pertaining to his convictions, but agree with his second contention. Accordingly, we affirm defendant's convictions but reverse and remand for resentencing in that case.

With respect to Case No. 031199, defendant challenges the imposition of an upward departure sentence on his conviction for second-degree burglary, ORS 164.215. In that case, the jury convicted defendant of second-degree burglary and unauthorized use of a vehicle, ORS 164.138, based on conduct that occurred on August 9, 2003. The trial court subsequently imposed an upward departure sentence on the burglary conviction based on "persistent involvement in similar offenses." As amplified below, we agree that the court erred in imposing that sentence, *see State v. Ramirez*, 205 Or App 113, 133 P3d 343, *adh'd to on recons*, 207 Or App 1, 139 P3d 981 (2006), *rev allowed*, 342 Or 256 (2007), and, consequently, we reverse and remand for resentencing in that case.

The circumstances material to our review are undisputed, except as specifically noted below. In Case No. 031183, defendant's convictions arose from a series of events that

occurred on August 19, 2003. At that time, defendant was staying with his ex-wife, Mitsi Norman, in Tillamook, helping her move into a new house. That afternoon, Norman's next-door neighbor, Lindsey Mays, telephoned her at work to tell her that he believed that defendant had broken into his house. Norman came home from work and found defendant in her home. Defendant was extremely anxious because a police officer had arrived outside of Mays's house, and he was worried that the officer suspected that he was the burglar. Norman, knowing that the police likely did suspect defendant, suggested to defendant that he leave through a bedroom window at the rear of the house. Norman then went outside and told the officer—Tillamook County Sheriff's Sergeant Jonathan Zimmerman—that defendant had just left her house. Tillamook City Police Officers Kurtis Wagner and Jana McCandless arrived to assist in the investigation, and the three officers began searching for defendant.

As the officers conducted their search, a man told them that he had seen a suspicious person matching defendant's description changing the tire on a truck on a nearby gravel road. Zimmerman, Wagner, and McCandless drove to the gravel road, left their cars, and walked up the road to investigate, with Zimmerman and Wagner in the lead and McCandless trailing behind at some distance to "watch the back." After walking up the gravel road "for a little bit," the officers heard a truck start up.

What happened next is a matter of sharp dispute between the state and defendant. Although the three officers' accounts varied in their details, they agreed on the substance of the following scenario: As the truck came around the corner into view, about 20 feet in front of the officers, Zimmerman and Wagner raised their hands and shouted for the driver to stop. Zimmerman could see that it was defendant who was driving the truck—and, once defendant made eye contact with the officers, he began to accelerate towards them, "revving" the engine higher. Believing that defendant intended to run over them, Zimmerman and Wagner moved to avoid being hit. Each officer drew his weapon, and Zimmerman fired three or four rounds at the truck as it came at and passed them.

The truck then continued a few yards down the gravel road towards McCandless, who, having heard the first shots, had unholstered her weapon. When McCandless determined that the truck was not going to stop, and would hit her if she did not move, she moved into blackberry brambles at the side of the road and fired several shots at the truck. The truck continued down the road, with the three officers running after it.

Meanwhile, a fourth officer, Tillamook County Sheriff's Deputy Mark Hannigan, was also involved in searching for defendant and began driving up the gravel road. As he did so, Hannigan saw defendant's truck coming at him from the opposite direction, about 75 yards away. At the same time, Hannigan could see the three officers running down the road behind the truck, and he heard one of them on the radio stating that the driver of the truck was the suspect. Hannigan believed that the truck was not going to stop and was "going to run over the top" of him, so he put his patrol car into reverse. At one point, defendant's truck and Hannigan's patrol car were "bumper-to-bumper" for about 15 to 20 feet, but Hannigan's car spun into a ditch, and defendant continued down the road. A high speed chase ensued, with defendant ultimately being apprehended the next day.

Defendant's account was very different. According to defendant, as he was driving down the gravel road at between five and ten miles per hour, he saw a police officer standing by the side of the road, pointing a gun at him. Defendant never saw that officer—or any officer—signal for him to stop. Instead, the officer just shot at him. At that point, according to defendant, he "freak[ed] out"—"I'm like I didn't know what I did wrong, man"—and, "lay[ing] over in the seat," accelerated with the officers shooting after him. When defendant finally "rais[ed] up," he saw a police car (Hannigan's) "backed up" "parked sideways on the road but not in the road"; defendant did not slow down but, instead, "went around him" and drove away.

Defendant denied attempting to run over the officers or driving "bumper-to-bumper" with Hannigan. At trial, as described below, defendant presented the testimony of a forensics expert, Verne Hoyer, who reconstructed what had

occurred based on his investigation and analysis of bullet trajectory patterns.

Defendant was charged with, *inter alia*, attempted first-degree assault against each of the four officers and felony attempt to elude. Defendant was convicted, by a nonunanimous verdict, of attempted first-degree assault against Zimmerman, McCandless, and Hannigan, but was acquitted with respect to the same charge involving Wagner. The jury also convicted defendant of felony attempt to elude. The court, in imposing sentence on the conviction for attempted first-degree assault involving Hannigan (Count 9), determined that that offense was not part of the same criminal episode as the attempted assaults against Zimmerman and McCandless (Counts 6 and 7); consequently, the court used the convictions on those two counts to "reconstitute" and enhance defendant's criminal history score on Count 9 from "F" to "B." The court further imposed upward departure sentences, based on judicial findings of aggravated factors, on each of the convictions for attempted assault and felony attempt to elude.

On appeal, defendant assigns error to (1) the trial court's *in limine* ruling pertaining to the admissibility of certain aspects of the testimony of defendant's expert, Hoyer; (2) the trial court's refusal to give defendant's proffered "jury unanimity" instruction; (3) the court's subsequent entry of judgments of conviction based on nonunanimous verdicts; (4) the court's calculation of defendant's criminal history score on Count 9, based on its determination that the attempted assault against Hannigan did not arise from the same criminal episode as the attempted assaults against Zimmerman and McCandless; and (5) the court's imposition of upward departure sentences based on judicial findings in both Case Nos. 031183 and 031199. For the reasons that follow, we reject defendant's first three assignments of error but agree with both the fourth assignment of error and with the fifth assignment of error with respect to the imposition of the departure sentence in Case No. 031199.[1]

---

[1] Given our disposition of the fourth assignment of error, which necessitates resentencing in Case No. 031183, we do not address the fifth assignment of error as to that case. We elect to follow that course, rather than the obverse, because of the virtual certainty that, if we did not address the fourth assignment of error on

Before addressing the particulars of the trial court's *in limine* ruling pertaining to the admissibility of some aspects of Hoyer's testimony, it is useful to put that matter into context. Defendant's theory of defense against the attempted assault and attempt to elude charges was that he had not attempted to run the officers down but, instead, had panicked after the officers fired at him. Central to that defense was the premise that the officers had lied about the events that took place on the gravel road—and had done so in order to cover up their use of firearms in violation of departmental policies governing use of "deadly physical force." That is, defendant contended, the officers fabricated a self-defense justification to avoid being disciplined for violating official policies that regulate police use of deadly physical force.

As support for that theory of defense, defendant sought to introduce expert testimony from Hoyer. In particular, Hoyer would (1) describe his conclusions, based on analysis of bullet trajectories, the officers' locations, and the speed of defendant's vehicle, as to what had occurred on the gravel road—and, particularly, testify that the officers had fired at defendant from the side of the road as he approached, passed, and was then past them; and (2) render his opinion that certain conduct by the officers in their efforts to apprehend defendant did not comport with competent police practice, including with respect to the use of deadly physical force.

The substance of Hoyer's putative testimony was set out in two letter reports that he had submitted to defense counsel. Neither of those reports referred specifically to written policies, including "deadly physical force" policies applying to Tillamook County or Tillamook City law enforcement personnel, much less expressed an opinion that any or all of the officers had, in fact, violated those particular policies. Rather, Hoyer rendered the opinion that Zimmerman, in particular, had deviated from sound police practices in several respects, including failing to secure the perimeter adequately, failing to maintain adequate communication with other officers, and employing deadly physical force without first exhausting other, less extreme measures and doing so in

appeal, the court's ruling underlying that assignment of error would reoccur on remand.

circumstances not warranting the use of such force. In that regard, Hoyer concluded that police conduct at the scene was "inappropriate," "demonstrated poor judgment," needlessly resulted in a dangerous high speed chase, and could have resulted in a wrongful death.

The state filed a motion *in limine* to exclude Hoyer's anticipated testimony in its entirety because that testimony, by focusing on the officers' conduct, as opposed to defendant's, represented an effort to "shift the blame" to the officers and, thus, "constitutes an attempt to create a special classification of victim covering law enforcement officers." The state also sought to exclude any reference to departmental policies governing the use of deadly physical force.

In the colloquy on that motion, the court addressed various aspects of Hoyer's putative testimony, as expressed in his written reports to defense counsel. The court determined that the results of Hoyer's investigation as to how many shots had been fired, where the officers had been standing "generally," and where the officers' shots struck defendant's truck would be admissible. The court further ruled that Hoyer's conclusions regarding time, distance, speed, and road condition were also admissible.

The trial court then addressed the portions of Hoyer's putative testimony pertaining to whether the officers' actions comported with sound police practice and procedure. The court concluded that Hoyer's testimony in that regard was irrelevant to the jury's consideration of defendant's culpability. In so ruling, the court went to great lengths, in a series of extensive colloquies with counsel, to emphasize that it was not precluding defendant from (1) presenting evidence through Hoyer that the "on the ground" facts comported with defendant's account rather than the officers'; (2) establishing, through cross-examination of the officers, the existence of the "deadly physical force" policies and the officers' familiarity with those policies and possible sanctions for their violation; and (3) if (1) and (2) were shown, arguing to the jury that the combination of those factors established a motive to fabricate, implicating bias.

During trial, following a clarifying offer of proof, defendant did present Hoyer's incident reconstruction testimony to the jury. Hoyer rendered the opinion that, given physical and temporal constraints, Zimmerman's account was not "humanly possible" and, for the same reasons, defendant would not have had time to have formed the intent to run over the officers and to have acted on any such intent. Neither during the offer of proof that preceded that testimony, nor at any other time, did defendant adduce testimony from Hoyer that the officers' conduct did, in fact, violate their departmental policies governing use of deadly physical force.

In addition, through cross-examination of Zimmerman, Wagner, and McCandless, defendant established that those officers' departments had published "deadly physical force" policies, that they were aware of those policies, and that they were aware that violation of those policies could result in termination. Defense counsel chose, for self-described "tactical reasons," not to offer the policies themselves into evidence but, instead, inquired of the officers regarding their content.[2] In closing argument, defense counsel referred to the officers' possible motive to fabricate to avoid the "very serious repercussions" of violating the "strict" policies limiting the use of deadly physical force. The jury, as noted, convicted defendant of three of the four attempted first-degree assault charges, as well as felony attempt to elude.

■ Against that backdrop, we return to the particulars of the first assignment of error. Defendant frames that assignment as follows:

"Defendant assigns error to the trial court's order granting the state's motion *in limine*, thereby precluding defendant from presenting expert testimony to assist the jury in determining whether the police officers violated policies and thus were subject to discipline, when they fired at defendant in his moving vehicle."

There are at least two threshold defects with that assignment of error. First, to the extent that defendant suggests that the court's ruling precluded Hoyer from testifying

---

[2] For example, Wagner testified that the Tillamook Police Department policy authorized the use of such force only if "the life or safety" of the officer or of a third person is "in jeopardy."

that some or all of the officers had violated "policies"—as opposed to testifying that their conduct evinced poor judgment and did not comport with competent practice—the court did not so rule. That is unsurprising because nothing in Hoyer's letter reports, which framed the discussion of the *in limine* ruling, referred to specific policies, including, particularly, the Tillamook County and city departmental policies regarding use of "deadly physical force" that were the predicate for defendant's "fabrication" attack.

Second, in a related sense, at no point did defendant ever adduce from Hoyer, by way of an offer of proof, what his opinion, if any, would have been regarding actual violation of the pertinent policies governing use of deadly physical force. Accordingly, the matter is not preserved. OEC 103(1)(b).

Beyond those deficiencies, to the extent that defendant is now suggesting that the trial court's ruling precluded defendant from presenting testimony, by Hoyer, that the officers' physical conduct did not, in the totality of circumstances, justify the use of deadly physical force, defendant is wrong. As described above, Hoyer testified that his assessment of the physical evidence flatly contradicted the officers' accounts. That testimony, in combination with that adduced through cross-examination of the officers regarding their awareness of their departmental policies and potential sanctions for their violation, permitted the jury to infer, if it so chose, that the officers had a motive to fabricate. Indeed, defense counsel so contended in closing argument. Accordingly, we reject the first assignment of error.

■　　Defendant's second and third assignments of error pertain to the trial court's refusal to give defendant's proffered "jury unanimity" instruction and the court's subsequent entry of judgment on some counts based on nonunanimous verdicts. Those assignments of error are unpreserved. Defendant's contention that the constitutional measure by which the "jury unanimity" language was added in 1934 to Article I, section 11,[3] of the Oregon Constitution does not

___

[3] Article I, section 11, provides, in part:

"[I]n the circuit court ten members of the jury may render a verdict of guilty or not guilty, save and except a verdict of guilty of first degree murder, which shall be found only by unanimous verdict, and not otherwise[.]"

comport with the "separate vote" provision of Article XVII, section 1, of the Oregon Constitution[4] does not satisfy the requisites for error apparent on the face of the record, ORAP 5.45, in that it presents a matter that is "reasonably in dispute." *State v. Brown*, 310 Or 347, 355, 800 P2d 259 (1990). Further, to the extent that defendant now invokes *Blakely v. Washington*, 542 US 296, 124 S Ct 2531, 159 L Ed 2d 403 (2004), as overruling *Apodaca v. Oregon*, 406 US 404, 92 S Ct 1628, 32 L Ed 2d 184 (1972), *sub silentio*, we have previously rejected that contention in the context of a preserved assignment of error. *State v. Bowen*, 215 Or App 199, 168 P3d 1208 (2007).

■ ■     We proceed to defendant's fourth assignment of error, which challenges the court's calculation of his criminal history score on his conviction for the attempted first-degree assault against Hannigan (Count 9). The court, over defendant's objection, declined to treat that offense as part of the "same criminal episode" as the attempted assaults against Zimmerman and McCandless (Counts 6 and 7) and, consequently, used the convictions on those two counts to enhance defendant's criminal history score on Count 9 from "F" to "B." We review the trial court's sentencing decision—specifically, its determination that the conviction on Count 9 did not arise from the same criminal episode as Counts 6 and 7—for errors of law. *State v. Fore*, 185 Or App 712, 716, 62 P3d 400 (2003).

■ ■     We begin by putting the asserted error in context. A defendant's criminal history score is used to calculate the sentence the court is to impose. OAR 213-004-0006. The score is determined by several factors, including the number and character of the offender's prior convictions. *Id.* When multiple convictions occur in the same proceeding, ones occurring in an earlier criminal episode may be used to recalculate the defendant's criminal history score with respect to convictions stemming from a later criminal episode. *State v. Bucholz*, 317 Or 309, 317, 855 P2d 1100 (1993); *State v. Allen*, 151 Or App 281, 290-91, 948 P2d 745 (1997). In contrast, when a

---

[4] Article XVII, section 1, provides, in part:

"When two or more amendments shall be submitted in the manner aforesaid to the voters of this state at the same election, they shall be so submitted that each amendment shall be voted on separately."

defendant's multiple convictions stem from the same criminal episode, his criminal history score remains the same with respect to all of those convictions.

■ To determine whether convictions arise from the same criminal episode, we apply the same test that governs our double jeopardy analysis. *State v. Kautz*, 179 Or App 458, 466-67, 39 P3d 937, *rev den*, 334 Or 327 (2002). Crimes arise from the same criminal episode when they are part of "continuous and uninterrupted conduct that * * * is so joined in time, place and circumstances that such conduct is directed to the accomplishment of a single criminal objective." ORS 131.505(4). As we explained in *State v. Sparks*, 150 Or App 293, 297, 946 P2d 314 (1997) (citing *State v. Boyd*, 271 Or 558, 565-66, 533 P2d 795 (1975)), the term "criminal episode" is synonymous with the phrase "same act or transaction." The Oregon Supreme Court has explained that "two charges arise out of the same act or transaction if they are so closely linked in time, place and circumstance that a complete account of one charge cannot be related without relating the details of the other charge." *State v. Fitzgerald*, 267 Or 266, 273, 516 P2d 1280 (1973).

Here, defendant argues that the three assaults (against Zimmerman and McCandless and against Hannigan) all arose from one criminal episode because the actions are so fundamentally related that a complete account of the third assault cannot be made without discussing the first two. As primary support for that argument, defendant invokes *Kautz*.

In *Kautz*, the defendant was convicted of numerous crimes, including one count of burglary and one count of robbery. 179 Or App at 460. The defendant had broken into a garage, taken various items, and attempted to leave in the victim's car. *Id*. As the defendant was leaving, the victim saw the defendant and attempted to stop him. *Id*. To prevent his capture, the defendant pointed a shotgun at the victim, told him to back off, and then fled. *Id*. The trial court treated the two convictions, one for unlawfully taking property (burglary) and one for overcoming resistance to the taking of property (robbery), as arising from separate criminal episodes and, based on that determination, declined to apply the

"shift-to-I" rule, OAR 213-012-0020, in imposing consecutive sentences for those crimes. *Kautz*, 179 Or App at 460.

On appeal, we reversed, holding that all of the defendant's acts were directed at one criminal goal and that the robbery was, in essence, simply a continuation of the burglary. *Id.* at 467. We concluded that, "[w]hile defendant may have acquired an additional criminal objective to escape when confronted by [the victim], his earlier objective to steal [the victim's] property continued during the course of all of the events." *Id.* Because of the continuity of purpose, and the fact that all the events took place in such a short period of time, it would be impossible to give a complete account of the robbery without first discussing the burglary. *Id.* In other words, the state would have needed to relate the facts of the burglary in order to explain why the defendant was using force to escape. As a result, we held that the two convictions arose from a single criminal episode. *Id.*

Defendant contends that his case is similar to *Kautz*, because the three assaults are so connected in time, place, and purpose that the circumstances of the third offense cannot properly be understood and assessed without reference to the first two. Defendant asserts that he had only one purpose throughout his interaction with the police—to flee from them—and, although he may have attempted to commit three assaults in the process, his actions occurred over the span of only a few hundred feet and within a few seconds, during which his goal to escape never wavered. Thus, defendant reasons, as with the two criminal acts in *Kautz*, it would be impossible to explain why and how he encountered Hannigan without reference to his encounter with the other officers mere seconds before. In sum, defendant asserts, everything that occurred on the gravel road was a single criminal episode.

The state counters that defendant's reliance on *Kautz* is misplaced for several reasons. First, the state points out that, while in *Kautz* there was only one victim, here, defendant assaulted three officers. Second, the state argues that the criminal acts in *Kautz* all transpired in one place, a garage and its driveway, whereas here, the encounters were separated by approximately 100 yards.

Further, invoking *Fore*, the state notes that, even assuming that the events transpired in a relatively brief time and proximate space, that is not, by itself, dispositive. In *Fore*, the defendant, an inmate working on a road crew in Marion County, ran away from the crew and, 20 minutes later, was seen three blocks away driving away from the area in a van. 185 Or App at 714. Later the same day, the defendant was apprehended near the same van in Josephine County. *Id.* The defendant was charged in Josephine County with unauthorized use of a vehicle (UUV). The defendant was also charged in Marion County with both second-degree escape and UUV. After being convicted on the Josephine County UUV charge, the defendant moved to dismiss the Marion County prosecution as being barred by, *inter alia*, statutory former jeopardy, ORS 131.515(2),[5] arguing that the Marion County charges arose from the "same criminal episode" as the Josephine County prosecution. The Marion County court granted that motion. *Fore*, 185 Or App at 714.

The state appealed only the dismissal of the second-degree escape charge, arguing that the defendant's escape and his subsequent UUV were not part of the "same criminal episode" for purposes of ORS 131.515(2), "because [the] defendant's escape was complete when he ran away from the work crew and before he took the van" and because "a complete account of each crime is possible without relating the details of the other." *Fore*, 185 Or App at 715. The defendant responded that the two events—the escape and UUV—were very closely linked in time and place. We acknowledged those circumstances but concluded, nevertheless, that mere temporal and spatial proximity was "not dispositive" because, as the state contended, a complete account of the escape could be related without relating the details of the defendant's theft of the van. *Id.* at 718. The state contends that the same reasoning controls here.[6]

---

[5] ORS 131.515(2) provides:

"No person shall be separately prosecuted for two or more offenses based upon the same criminal episode, if the several offenses are reasonably known to the appropriate prosecutor at the time of commencement of the first prosecution and establish proper venue in a single court."

[6] Similarly, the state refers to *State v. Stolz*, 106 Or App 144, 806 P2d 715 (1991), which also addressed the proper application of "same criminal episode" for

Finally, the state challenges defendant's theory that, because his acts were geared to one criminal objective, they are all part of one criminal episode. The state points out that the Oregon Supreme Court has held that "the test of a single criminal objective is no panacea," *State v. Kessler*, 297 Or 460, 465, 686 P2d 345 (1984), for ascertaining the contours of a criminal episode.[7]

In *Kessler*, the defendant was one of six inmates who escaped from prison, in the process of which they kidnapped two correctional officers and four lay ministers who were visiting the prison at the time. *Id*. at 462. The prisoners captured the six victims and stole their clothes in order to obtain disguises to effect their escape. *Id*. The Supreme Court upheld the trial court's decision to treat each kidnapping conviction as having arisen from a separate criminal episode, even though each act was committed within a short space of time and place and all were aimed at achieving the same purpose. *Id*. at 465-67. In so holding, however, the court cautioned that "the fact that the criminal conduct involved multiple victims was no casual coincidence." *Id*. at 467. Rather, "[e]ach of the civilian victims was summoned for a purpose, to obtain his clothing for one of the prisoners." *Id*. Thus, because "it mattered to the defendant or to his objective who or how many persons" were kidnapped, the court reasoned that these were all separate criminal episodes. *Id*. at 468.

The state is correct that various circumstances—*e.g.*, temporal and spatial proximity and commonality of purposes—are, when considered in isolation, insufficient to compel a determination that different offenses arose from the same criminal episode. Nevertheless, where those circumstances are so interrelated that a complete account of one offense cannot be related without relating details of the other(s), the offenses must be deemed to have arisen from the

statutory former jeopardy purposes. In *Stolz*, the defendant resisted arrest after being arrested for violating a restraining order and was charged with both offenses. We concluded that the resisting arrest charge arose from a separate criminal episode from the charge (violation of the restraining order) for which the defendant was arrested, because "[d]etails of the offense underlying an arrest are not required to be shown to prove any element of resisting arrest." *Id*. at 148.

[7] *Kessler* addressed the closely analogous question of whether the defendant's crimes constituted a "single criminal episode" "assessing whether multiple statutory violations were meant to carry cumulative punishment * * *." 297 Or at 465.

same criminal episode, including with respect to calculation of criminal history score. That standard was satisfied here.

We begin by emphasizing the extreme temporal (a matter of seconds) and spatial (roughly 100 yards) proximity here. Indeed, Hannigan could see the other officers running down the gravel road, chasing defendant's truck, as the truck bore down on him. In cinematographic terms, the "action" all occurred in a single "scene." Further, as defendant contends for sentencing purposes—and we do not understand the state to dispute—defendant's actions within that extremely limited "window" were motivated by a single, undifferentiated objective to avoid apprehension.

Most significantly, in large part as a product of those circumstances, it would have been functionally impossible for defendant to present his defense as to attempted assault against Hannigan—*viz.*, that he was crouched down behind the wheel of his truck in a panicked response to avoid being hit by the other officers' gunshots—without relating details of the encounter with those officers. By the same token, those circumstances bear directly on the state's ability to prove that defendant intended to cause serious physical injury to Hannigan, as opposed to merely acting recklessly. Because of that inextricable functional intertwining, this case differs sharply from those, like *Fore* and *Stoltz*, that the state invokes. We thus conclude that, because the conviction on Count 9 arose from the same criminal episode as Counts 6 and 7, the trial court erred in its determination of defendant's criminal history score on Count 9. That error requires a remand for resentencing in Case No. 031183.

■ We turn, finally, to defendant's challenge to the imposition of an upward departure sentence on his conviction for second-degree burglary in Case No. 031199. Although defendant did not raise his present *Blakely*-based objection before the trial court, we conclude, under the reasoning of *Ramirez*, 205 Or App 113, that the imposition of the departure sentence was error apparent on the face of the record. ORAP 5.45(2). Further, for the reasons described in *Ramirez*, we exercise our discretion under *Ailes v. Portland Meadows, Inc.*, 312 Or 376, 823 P2d 956 (1991), to address that error. Accordingly, we remand for resentencing in Case No. 031199.

In Case No. 031183, reversed and remanded for resentencing; otherwise affirmed. In Case No. 031199, reversed and remanded for resentencing; otherwise affirmed.